# EXHIBIT 1

**Expert Opinion of C. J. Brainerd, PhD**

**Referral Question**

I have been asked by counsel to review various documents in connection with a potential *Daubert* motion to preclude the proffered testimony of Ms. Margaret R. Sweeney in *United States v. John Richard Ferguson*. Based upon my knowledge of the scientific literature and my own research program, Mr. Ferguson's counselors have asked that I provide opinions on certain points that may help the court to evaluate the motion to preclude the proffered testimony. Should the government's proffered testimony be admitted at trial, I would testify to assist in rebutting it.

**Qualifications**

I am currently a tenured Professor at Cornell University, where I serve as Director of the Memory and Neuroscience Laboratory and as Director of the PhD/JD Program in Psychology and Law. I teach courses in the areas of memory and the law, cognitive neuroscience, developmental psychology, and the psychology of the death penalty. I direct the training of PhD students and law school students. I hold a PhD in experimental and developmental psychology. I have published more than 300 peer-reviewed journal articles and book chapters and more than 20 books. For three decades, my research has been centered on human memory, especially false memory, forgetting, and other forms of memory distortion, and on forensic applications of memory research. This research includes experimentation with subject populations whose memories are compromised in some way, such as children, adolescents, learning-disabled individuals, patients with psychosis, and patients with mild cognitive impairment and dementia. During the course of my research, I developed one of the contemporary theoretical accounts of memory distortion and forensic memory, fuzzy-trace theory, which has been widely applied in the scientific literature. In addition to my publications in peer-reviewed journals, I have long served on their editorial boards, and I have also served as Editor and Associate Editor of some of those journals. Scientists who served in those capacities are responsible for administering and applying the procedures that create reliable findings—namely, the procedures of peer review. I have been elected to the Society of Experimental Psychologists and to the National Academy of Education. I am a Fellow of 5 divisions of the American Psychological Association. I am also a Fellow of the Association of Psychological Scientists and of the Psychonomic Society. I have been qualified as an expert witness in state, federal, and military courts, including several cases that were similar in nature to the present one. I have also been qualified as an expert witness in Frye and Daubert hearings that focused on questions about the scientific reliability of expert testimony that resemble those in the present case (e.g., *State of Kentucky v. Parker*, *State of New Jersey v. J.L.G.*).

For more than three decades, I have provided expert opinions and expert testimony in criminal and civil cases in which the accuracy of allegations depended on the reliability of memory reports made by child and adolescent witnesses. Those cases include ones with allegations of sexual abuse that are similar to the present case. They also include cases in which the reliability of expert testimony such as that proffered by the government was tested.

**Opinion**

To decide whether the proposed expert testimony satisfies the *Daubert* standard of reliability, it is essential to evaluate the *source* of the content of the testimony—in particular, whether it derives from studies in the peer-reviewed scientific literature that meet the *Daubert* standard versus some other, non-scientific method. I will consider that matter throughout this section. In light of the material that will be discussed, the gist of my opinion is that the government's proposed expert testimony clearly does not satisfy the *Daubert* standard for admission of expert testimony.

*Scientific Reliability*

Under *Daubert*, the content of expert testimony must be scientifically reliable; that is, it must derive from research that implements the scientific method of establishing reliability. To establish a clear contrast between scientific reliability and the unreliable bases for the proposed testimony, I first discuss what scientific reliability must consist of, which is that it follows a few simple principles.

As spelled out in the *Daubert* standard, scientists generate reliable evidence on a specific topic by, first, formulating it as a hypothesis that can actually be confirmed or disconfirmed in an experiment, by, second, conducting experiments that use appropriate procedures with known error rates (which allows tests of statistical significance and effect size to be computed), by, third, publishing the results in peer-reviewed journals (where knowledgeable peers determine if the hypothesis was actually testable and the procedures were actually appropriate), and by, fourth, building consensus within the scientific community by conducting further research that replicates and extends the experiments' findings. To the extent that these principles are kept firmly in mind, the inherent reliability problems with expert opinions that are based on non-scientific methods become clear.

The aforementioned rules for establishing scientific reliability are not the basis for the content of Ms. Sweeney's proffered testimony. Instead, it will derive from the professional experience, education, and training of the witness; that is, the memory and judgment of one person. Hence, the basis for the proposed testimony is not objective and publicly verified, as scientific evidence is. Rather, Ms. Sweeney's proffered testimony is subjective, personal, and, therefore, prone to well-known psychological illusions and biases. What is being proposed, then, is to present evidence whose sources lie outside the boundaries of scientific reliability and are not constrained by its methods and findings—specifically, the four rules that I mentioned. Needless to say, there can be no consensus in any scientific community that evidence that derives from unscientific methods is scientifically reliable. That would be an oxymoron. The inherent reliability problems with such evidence are well illustrated by historical examples of expert evidence that (a) was based on professional experience (often called clinical experience or professional wisdom), education, and training, (b) was presented to triers of fact for many years, but (c) was eventually shown to be unreliable when it was converted to testable hypotheses and evaluated with the scientific method.

### *The RMS Example of Unreliability*

A classic example in the realm of sexual abuse of children is provided by repressed memory syndrome (RMS), which was the basis of the recovered memory epidemic of the 1980s and 1990s. RMS supplied the grounds for many criminal prosecutions and civil actions, and it was central to expert testimony provided by clinical practitioners that was founded on their professional experience, education, and training. In these cases, adult claimants accused defendants of having sexually abused them as children, on the strength of new memories that had recently been exhumed during therapy, using methods (e.g., age regression, bibliotherapy, journaling) whose safety and effectiveness had not been scientifically substantiated. In that era, RMS was commonly accepted by therapists and counselors, on the basis of their professional experience, their graduate education, and their post-graduate training. Expert testimony by such practitioners on the reliability of RMS was widely admitted in criminal and civil cases. Ultimately, however, RMS was debunked in scientific experiments conducted by memory researchers.

Initially, some researchers pointed out that RMS lacked scientific substantiation of the sort that is required under *Daubert*, and further, that despite thousands of claims of adult recovery of repressed childhood memories of sexual abuse, there were no examples in the scientific literature in which any instances of RMS had been confirmed by unimpeachable independent evidence. Next, other researchers pointed out that RMS was scientifically unreliable on its face because it violated four fundamental laws of human memory that have been confirmed in hundreds of controlled experiments. They are the proximity law of accuracy, the encoding specificity law, the traumatic salience law, and the verbatim fade-out law. Finally, despite the enormous difficulty of determining the accuracy of memories for events that are decades in the past, cases were identified in which adult recovered memories of childhood sexual abuse, though strongly believed, were demonstrably false because physical evidence showed that the events could not have happened (e.g., Binjimin Wilkomirski, Elizabeth Rutherford). The denouement was that RMS was ruled to be scientifically unreliable in *Frye* and *Daubert* hearings (e.g., the *Hungerford-Morahan* hearing in New Hampshire), and some practitioners' licenses were suspended for practicing recovered memory therapy, but only after much damage to individuals and families in legal proceedings (Brainerd, C. J. *The science of false memory*. New York: Oxford University Press, 2005).

A remaining question that most of us would ask, because it bears so directly on the unreliability of evidence derived from professional experience, education, and training, is: How could so many people with so much experience and training have been so wrong for so long? Here, it is instructive to consider the following point. The job of practitioners when working with child or adult clients who allege sexual abuse is not to act as fact finders. Rather, their job, which is to understand their clients' problems and help them overcome those problems, actually conflicts with fact finding. The conflict is that practitioners are trained to accept and understand whatever realities their clients believe are affecting them – not to challenge clients' beliefs in order to find the facts. Moreover, in the course of accepting their clients' realities in order to

-3-

help them, it is difficult not to commit the error of assuming that those realities are objectively true, even to the point of representing them as true in legal proceedings. This error, which is an instance of the familiar psychological phenomenon of confirmation bias, is so seductive that practitioners' professional societies have found it necessary to issue resolutions warning against it. A well-known illustration is a caution that the American Medical Association issued to psychiatrists in connection with RMS, which stated in part that "few cases in which adults make accusations of childhood sexual abuse based on recovered memories can be proved or disproved and it is not yet known how to distinguish true memories from imagined events in these cases." (Council on Scientific Affairs, American Medical Association, Annual Meeting, 1995).

As the RMS example illustrates, the core problem with expert testimony whose content has not been shown to be scientifically reliable is that it can simply be wrong in the sense that it presents information to the trier of fact that cannot be shown to be reliable---and is, in fact, actually *unreliable*. It is worth noting that instances of this problem can be found in the content of the proposed testimony of Ms. Sweeney. For one, Ms. Sweeney says the basis of her opinion is interviews with witnesses and victims. It is not based on, for example, a hypothesis that is tested for reliability. There is no indication that she ever tested or confirmed that, of the "2,500 interviews" of witnesses and children she conducted, that she verified that abuse actually occurred.

Not only does Ms. Sweeney's disclosure provide no basis to ascertain reliability, it appears she plans to testify about concepts that are highly unreliable. Specifically, some of the behaviors of children and adolescents who allege sexual abuse that will be described in the testimony are well-known claims of Roland Summit's child sexual abuse accommodation syndrome (CSAAS). Salient examples of such behaviors are: gradual and delayed disclosure, denial of abuse, grooming and resistance to abuse, secrecy, the dynamics of disclosure, and recantation of disclosures (*State of New Jersey v J.L.G.*). Although this terminology is not specifically acknowledged in the government's expert disclosure, the topics Ms. Sweeney proposes to testify about are straight out of CSAAS. As a few examples:

| CSAAS Concept | Ms. Sweeney's Proposed Testimony |
| --- | --- |
| CSAAS covers the concept of sexually abused children "fac[ing] 'an overpowering adult' who 'is often in a trusted and apparently loving position."[1] | Ms. Sweeney proposes to testify about the "[i]mpact of abuse by a known offender/someone in a position of authority." |
| Two of the CSAAS behaviors are "helplessness" and "accommodation."[2] | Ms. Sweeney proposes to testify about how "[m]any victims experience a sense of **helplessness** regarding the abuse or assault and show **accommodation** behaviors." (emphases added). |

---

[1] *State v. J.L.G.*, 190 A.3d 442, 452 (N.J. 2018) (quoting Roland C. Summit, *The Child Sexual Abuse Accommodation Syndrome*, 7 Child Abuse & Neglect 177, 182-83 (1983)).
[2] *Id.* (quoting *Summit, supra*, at 182-83, 186-87).

-4-

| In describing CSAAS, Dr. Summit wrote that children will not "forcibly resist," but rather will "submit quietly."[3] | Ms. Sweeney proposes to testify that "one common response" to sexual abuse is "a lack of physical or verbal resistance." |
|---|---|
| "Finally, on retraction, Dr. Summit wrote that . . . the 'normal' course [is to] retract her complaint."[4] | Ms. Sweeney proposes to testify that "[d]enial of the abuse or recantation of the allegation of abuse is not uncommon." |

### *The CSAAS Example of Unreliability*

The problem with presenting evidence that features the precepts of CSAAS is that CSAAS is a well-known but debunked clinical hypothesis about victims of child sexual abuse that, like RMS, provides an instructive case study in the fallibility of expert evidence that derives from professional experience, education, and training. CSAAS was proposed three decades ago by Dr. Roland Summit. As is true for most invalid clinical hypotheses (e.g., claims about the effectiveness of hydroxychloroquine and convalescent plasma during the Covid19 pandemic), CSAAS was based on Summit's professional experience, education, and training—in particular, experience treating adult women who reported a prior history of child sexual abuse. Summit conducted no research on CSAAS, and there was no scientific substantiation of it by others. Rather, it was based on an unreliable form of professional inference, which is known as behavioral symptomology. Despite the lack of scientific substantiation, as in the present case, the precepts of CSAAS have long figured prominently in expert testimony provided by practitioners who work with clients who allege sexual abuse histories. At last count, such testimony has been presented in criminal cases in over 40 states. Remarkably, until 2017 no court had conducted a *Frye* or *Daubert* hearing to determine whether CSAAS was scientifically reliable. The first *Frye* hearing occurred in New Jersey Superior Court (*State of New Jersey v. J.L.G.*). The evidence presented there showed that multiple peer-reviewed scientific literature reviews had been published that documented both the original lack of scientific substantiation of CSAAS's claims and subsequent scientific disconfirmation of those claims. More explicitly, when qualified psychological researchers reviewed the scientific literature and published their findings in peer-reviewed articles, the findings did not substantiate CSAAS's claims.

The evidence presented at the New Jersey *Frye* hearing also showed that Summit himself had not intended that CSAAS be used for purposes beyond therapy and had cautioned against the use of CSAAS's claims in expert testimony. Even with such qualifications, however, it is important to note the CSAAS is not recognized as an accepted diagnosis in the Diagnostic and Statistics Manual of the American Psychiatric Association. The Superior Court ruled that CSAAS is not reliable, and its precepts cannot therefore be presented in expert testimony. That ruling was subsequently upheld by the New Jersey Supreme Court (*State of New Jersey v J.L.G.*). Both courts ruled that the claims of CSAAS that there is a constellation of behaviors and reactions that are reliably associated with child sexual abuse have never been scientifically

---

[3] *Id.* (quoting *Summit*, *supra*, at 183).
[4] *Id.* (quoting *Summit*, *supra*, at 188).

substantiated, have not gained general acceptance in the relevant scientific community, and that some of these claims have been directly disconfirmed by scientific research.

### *Conclusions*

In closing, I stress that the larger lesson of examples such as RMS and CSAAS testimony revolves around the inherent unreliability of evidence that derives from professional experience, education, and training, rather than from research that implements the scientific method described earlier. There are many reasons for this inherent reliability problem, but perhaps the most fundamental ones are the lack of public accountability and revision of knowledge that are the hallmarks of peer review and independent replication. An individual scientific study may be conducted using confounded, inappropriate, or otherwise limited procedures, leading to unreliable findings. The process of peer review is designed to detect such errors, preventing publication of the findings in the scientific archive until they are revised in subsequent research. Sometimes, the errors escape detection at the peer-review stage, and the findings are published. Then, however, the next step follows: independent replications by other researchers. If the findings are unreliable by-products of confounded methods, they will not stand up to replication. In the end, scientific consensus as to the reliability of any set of findings builds apace as the number of peer-reviewed publications and independent replications grows. Neither of these public checks on unreliability applies to testimony derived from professional experience, education, and training, which is the type of testimony offered by the government through Ms. Sweeney in this case. Owing to that fact, examples such as RMS and CSAAS, in which unreliable clinical syndromes and treatments have persisted in expert testimony for many years before the courts ruled them to be unreliable are common. In the case of CSAAS, the fact that it is not scientifically reliable is self-evident from the fact that the first two steps that I described earlier were never taken: Summit never formulated it as a testable hypothesis and never conducted any experiments to test such a hypothesis.

To sum up, I have explained how scientific reliability works under *Daubert*—how scientists produce facts that can be accepted as reliable under that standard. I have also attempted to explain why the alternative method that is the basis for the proposed testimony from Ms. Sweeney does not produce evidence that satisfies the *Daubert* standard. Indeed, there are well-known examples in which that method has produced unreliable evidence that was central to expert testimony for many years before courts ruled, on the basis of scientific findings, that it was unreliable. For those reasons, the government's proposed expert testimony in the present case is clearly not reliable by the *Daubert* standard.

Cordially,

*C. J. Brainerd*

C. J. Brainerd, PhD