# EXHIBIT A

**OFFICE OF THE FEDERAL PUBLIC DEFENDER**
**DISTRICT OF MARYLAND**
SOUTHERN DIVISION
6411 IVY LANE, SUITE 710
GREENBELT, MARYLAND  20770
TEL: (301) 344-0600
FAX: (301) 344-0019
TOLL FREE: (855) 213-8450

| | |
|---|---|
| JAMES WYDA<br>FEDERAL PUBLIC DEFENDER | ELLIE MARRANZINI; CYNTHIA FREZZO<br>ASSISTANT FEDERAL PUBLIC DEFENDERS |

February 20, 2025

Christopher Sarma and Megan McKoy
U.S. Attorney's Office – District of Maryland
Via Email: csarma@usa.doj.gov; megan.mckoy@usdoj.gov

> Re:  *United States v. John Richard Ferguson*
>      Criminal Case No. 24-152-DLB
>      Expert Disclosure: Dr. Charles J. Brainerd

Dear Counsel:

At trial and at a forthcoming *Daubert* hearing, the Defense may call Dr. Charles Brainerd as a responsive expert to the government's disclosures regarding Ms. Margaret Sweeney. Dr. Brainerd is an expert in human memory, particularly with subject populations whose memories are compromised in some way, including children and adolescents. As the director of a laboratory and experienced researcher, Dr. Brainerd will also testify as an expert in scientific reliability. The Defense provides this expert disclosure pursuant to Federal Rule of Criminal Procedure 16(b)(1)(C).

Dr. Charles J. Brainerd is a tenured professor at Cornell University, where he serves as the Director of the Memory and Neuroscience Laboratory and as Director of the J.D./Ph.D. Program in Psychology and Law.  Dr. Brainerd has extensive experience studying, writing, and testifying on CSAAS and its inherent unreliability.  Attached, please find Dr. Brainerd's curriculum vitae.  Within his curriculum vitae, you will find a list of all cases in which Dr. Brainerd has previously testified as an expert. Those that occurred within the last 5 years are highlighted in yellow.

Dr. Brainerd will base his testimony on his review and analysis of the government's expert disclosure for Margaret Sweeney, as well as Ms. Sweeney's curriculum vitae. Consistent with the attached report, Dr. Brainerd will testify regarding his background and expertise.  He will testify about the scientific unreliability of certain areas of forensic testimony, including repressed memory syndrome ("RMS") and CSAAS.  Dr. Brainerd will

February 20, 2025
Page 2

testify that Ms. Sweeney's proffered opinion is not based on reliable scientific methods, and that CSAAS generally is not accepted as scientifically reliable.

  The Defense reserves the right to offer additional testimony by this expert witness, and for the expert to amend or adjust his opinions and the bases for those opinions due to information made known to the expert before or during a hearing or trial in this case.

            Sincerely,

            /s/

            Ellie Marranzini and Cynthia Frezzo
            Assistant Federal Public Defenders
            Counsel for Mr. John Richard Ferguson


Pursuant to Federal Rule of Criminal Procedure 16(b)(1)(C)(v), I have reviewed and approve this disclosure.

Signed: _____ *[signature: C. Brainerd]* _____
      Dr. Charles J. Brainerd

Date: 2/20/25

# EXHIBIT B

# Margaret Rae Sweeney, MSW, LSW

Federal Bureau of Investigation
600 Arch St. Philadelphia, PA 19106
PHONE:                    EMAIL:

**EDUCATION & LICENSURES**
    Licensed Social Worker, Pennsylvania, 2013-Present
    Widener University, PA, MSW in Clinical Social Work, 2013
    West Chester University of Pennsylvania, PA, BSW, Social Work, 2006

**PROFESSIONAL EXPERIENCE**

***Forensic Child Interview Specialist, 9/2020-Present***
    **Department of Justice, Federal Bureau of Investigations, Philadelphia, PA**
- Conduct forensic interviews of child and adolescent victims and/or witnesses to include sexual and physical abuse, exploitation, abduction, terrorism and/or witnesses of violent crime.
- Develop, coordinate, and provide training for FBI agents, local, federal, tribal and international law enforcement.
- Consult with FBI agents, local, federal, tribal and international law enforcement, as well as federal, state and local prosecutors to include reviewing victim interviews, recommendations regarding interview approaches, victim testimony, multi-victim cases, and complicated and high-profile cases.
- Participate in the process and development of multi-disciplinary teams (MDTs) and child protection teams (CPTs) in communities where they do not exist to foster effective investigation and prosecution of child abuse and exploitation cases.
- Develop educational materials, professional articles, and other written materials that advance knowledge of the child interviewing program and current issues associated with interviewing child victims and witnesses.
- Testify as both a subject matter expert and a fact witness to the case.

***Mission Kids Child Advocacy Center (CAC), 10/2010-9/2020***
    **Program Manager, 12/2014-12/2016; 3/2018-9/2020**
    **Manager of Forensic Services, 1/2017-3/2018**
    **Forensic Interviewer, 10/2010-9/2020**
- Provide supervision of MK program staff and volunteers, including program monitoring and evaluation.
- Provide direction to programs of MK with a view towards the National organization and other child advocacy centers around the country.
- Review referrals with program staff, monitor screening process and provide best practices to case management. Assume a leadership role in expediting referral decisions and management of case logistics within MK.
- Develop, implement and monitor on an ongoing basis an organizational and programmatic system to ensure appropriate quality control of all program activities.
- Assure state-of-the art methodologies, practices and programs in all areas of MK work with sexually abused children.
- Conduct professional forensic interviews of children and adolescents who are alleged victims of sexual abuse, severe physical abuse, or have witnessed a violent crime. Testify in civil and criminal court proceedings as required.
- Implement and maintain the procedures, policies and operational manuals for MK in compliance with the accreditation standards of the National Children's Alliance (NCA) and the local protocol.
- Promote strong, effective working relationships with partner agencies and other service providers.
- Collaborate and liaison with community organizations to market, network, and build a collaborative working relationship between MK and other programs. Support the marketing activities for the services through a variety of mediums.

JF_1465

# Margaret Rae Sweeney, MSW, LSW

Federal Bureau of Investigation
600 Arch St. Philadelphia, PA 19106
PHONE: ███████   EMAIL: ███████

- Assist the Associate and Executive Director on an as needed basis.
- Planned, organized and executed County wide 2 day training conference hosted by Mission Kids CAC with national presenters to educate MDIT members.
- Provide supervision, training and quality assurance of MK Forensic Interviewers.
- Assume a leadership role in recruitment and retention of all Forensic Interviewers, which consists of development of training schedules, orientations and intensive instruction and supervision until and after probationary period is over.
- Provide direction to forensic interviewing program of MK with a view towards the NCA standards and other child advocacy centers around the country.
- Provide technical support and guidance regarding best practices in forensic interviewing to other CAC's and programs serving children.

### *Montgomery County Office of Children & Youth, 7/2006-10/2010*

**Supervisor, 5/2009-10/2010**
- Intake Supervisor, supervising 2 caseworkers in the intake division.
  - Responsible to guide caseworkers in making decisions on children's safety, permanency and well-being.
  - Drug and alcohol liaison within the Agency, responsible to work with the caseworkers in making the safest decisions for newborns who are born drug positive and children pre-school aged that become known to the Agency.

**Caseworker, 7/2006-5/2009**
- Intake caseworker, investigating allegations of child abuse and neglect.
- Investigations would include combined efforts with Juvenile Detectives from various police departments across the County.
- Conduct interviews of alleged victims named in the report, as well as any other persons relevant to the allegations.
- Engage families and victims to ensure safety, well-being and permanency.
- Provide support through resources to families in need of housing, food, clothing and essentials to live.
- Responsible to work with diverse families in their homes one-on-one through active, engaged listening to ensure safety of child abuse victims.

**PRESENTATIONS/TRAININGS PROFESSIONAL CONFERENCES**
- Sweeney, M. & Yesensky, J. (2024, August). *Case Study: Online Live Stream Investigations.* Dallas Crimes Against Children Conference. Dallas, TX. August 11-15. 2024.
- Sweeney, M. (2023, June). *Adolescent & Compliant Victims.* National Law Enforcement Training on Child Exploitation.  Atlanta, GA.  June 14-15, 2023.
- Sweeney, M. Goldstein J. (2023, February). *Human Trafficking and the Forensic Interview*. Maryland MDT Training for CAC's. February 16, 2023. Virtual Presentation.
- Sweeney, M., Ringwood, B. Kelly, K. & Henry, G. (2022, August). *Case Study: Strangulation, the Silent Killer*. Dallas Crimes Against Children Conference. Dallas, TX. August 15-18, 2022.
- Sweeney, M. & Canales, N. (2022, July*). Human Trafficking and the Forensic Interview*. New Jersey Human Trafficking Task Force. Trenton, NJ. July 13, 2022.
- Sweeney, M. & Brunette, B. (2022, June). *Suggestibility; FBI Forensic Interviewing Protocol; Adolescent & Compliant Victims*.  International Office for the Development of Justice Systems. Monterrey, Mexico. June 28-30, 2022.
- Sweeney, M. (2021, November). *Adolescent Development & Human Trafficking*. SEED Training for Kurdistan. November 22, 2021. Virtual Presentation.
- Sweeney, M. & Martucci, S. (2021, June).  *Presenting Evidence: A Picture is Worth a Thousand Words*. Presented at National Children's Alliance Leadership Conference. Virtual presentation.

# Margaret Rae Sweeney, MSW, LSW

Federal Bureau of Investigation
600 Arch St. Philadelphia, PA 19106
PHONE:            EMAIL:

- Sweeney, M. & McDyre, M. (2020, January). *Mission Kids 101 and the Response to Human Trafficking.* Presented at the Human Trafficking Education Conference: Bonds Worth Breaking, Lansdale, PA.
- In Her Own Words: A Human Trafficking Survivor Tells Her Story, Panel Discussion. Cabrini University. November 6, 2019.
- Sweeney, M. (2019, October). *Child Advocacy Center Model & Forensic Interviewing.* Presented at the Pennsylvania Juvenile Officers Association 2019 Training Conference, Harrisburg, PA.
- Sweeney, M. & Vodzak, K. (2018, June). *Forensic Interviewing and Conducting Trauma-Informed Investigations.* Presented at the 6th Annual Title IX Summit: Power, Politics & Privilege, Rowan University, NJ.
- Sweeney, M. (2016, October). *Mission Kids Child Advocacy Center.* Presented at A Professional Guide to Understand the Impact of Domestic Violence on Children Training, Domestic Violence Legal Network of Montgomery County Education/Awareness Committee, Montgomery County Fire Academy, PA.
- Sweeney, M. & Ringwood, B. (2015, October). *Mission Kids Child Advocacy Center.* Presented at the Domestic Violence Symposium, Cabrini College, PA.
- Domestic Violence Symposium: A Response to Dating Violence and Sexual Assault, a Panel Discussion, Cabrini College. October 15, 2015.
- Keeping Children Safe: Child Victims of Domestic Violence, a Panel Discussion. Cabrini College. October 8, 2014.
- Crocetto, J., Sweeney, M., & Long, H. (2012, June). *Mission Kids Child Advocacy Center: Helping Kids Triumph over Trauma.* Presented at the Recovery from Trauma Conference, Montgomery County, PA.

## SKILLS/AWARDS/CERTIFICATIONS

- Social Work Active Licensure, Commonwealth of Pennsylvania, License # SW130857
- Forensic Interviewing with Children (completed National Children's Advocacy Center training courses including Basic Forensic Interviewing, Advanced Forensic Interviewing, Extended Forensic Assessment; Prepare and Predict (completed Homeland Security Investigations Forensic Interviewing training); FBI Presenting Evidence Training (completed Federal Bureau of Investigations presenting evidence training)
- Qualified as an expert witness in US Federal Court as an expert is victim dynamics and behavior, disclosure process and the dynamics of child abuse.
- Fluent in Mac and Microsoft Office applications, NCATrak, and Internet applications
- Montgomery County Anti-Trafficking Coalition (MCAT), Board Member. 2018-2020.

JF_1467

# EXHIBIT C



**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*
*Southern Division*

---

| | | | |
|---|---|---|---|
| *Christopher M. Sarma*<br>*Assistant United States Attorney*<br>▆▆▆▆▆▆▆ | *Mailing Address:*<br>6500 Cherrywood Lane, Suite 200<br>Greenbelt, MD 20770-1249 | *Office Location:*<br>6406 Ivy Lane, 8th Floor<br>Greenbelt, MD 20770-1249 | DIRECT: ▆▆▆▆<br>MAIN: 301-344-4433<br>FAX: 301-344-4516 |

December 15, 2024

   Re: <u>United States v. John Richard Ferguson</u>,
      DLB 24-152

Ellie Marranzini, Esq.
Cynthia Frezzo, Esq.
Assistant Federal Public Defenders
Office of the Federal Public Defender
6411 Ivy Lane, Ste. 710
Greenbelt, Maryland 20770

Dear Counsel:

  Pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G), the government hereby provides this notice of intent to call Margaret Sweeney as an expert witness in the above-referenced case.[1]

  As required by Rule 16, such disclosures include a complete statement of all opinions rendered by this witness that the government intends to use during its case-in-chief at trial under Federal Rules of Evidence 702, 703, or 705, or during its rebuttal to counter testimony that the defendant has timely disclosed under (b)(1)(C). It additionally includes the bases and reasons for the opinions of the witness, the qualifications of the witness, publications authored by the witness in the previous 10 years, and a list of all other cases in which, during the previous 4 years, the witness has testified as an expert.

<u>**Margaret Sweeney – Common Victim Dynamics in Crimes Involving Sexual Abuse & Assault**</u>

  Ms. Sweeney is a licensed social worker and forensic child interview specialist with the Federal Bureau of Investigation. In this capacity, she conducts forensic interviews of child and adolescent victims and/or witnesses to include sexual and physical abuse, exploitation and develops, coordinates, and provides training for FBI agents, local, federal, tribal and international

---

[1] The Government requests that pursuant to Fed. R. Crim. P. 16(b)(1) you promptly provide us with adequate notice of any experts you intend to call at trial, including a complete statement of all opinions that the defendant will elicit from the witness in the defendant's case-in-chief; the bases and reasons for them; the witness's qualifications, including a list of all publications authored in the previous 10 years; and a list of all other cases in which, during the previous 4 years, the witness has testified as an expert at trial or by deposition.

JF_1460

law enforcement. Before joining the FBI in 2020, she worked for the Mission Kids Child Advocacy Center for a decade, including as their program manager. She has completed extensive professional training, attended numerous trainings and conferences, and has passed many certification courses to conduct such work. Ms. Sweeney's testimony will be based on her education, training, and experience (as set forth in her CV).

Ms. Sweeney has over a decade of experience working with and interviewing adolescent and child victims of sexual abuse and assault. Ms. Sweeney has participated in thousands of investigations involving allegations of sexual abuse and assault and has interviewed thousands of witnesses and victims. Specifically, she has conducted approximately 2,500 interviews over 14 years that include cases of online sexual explanation, including CSAM production and sextortion, human trafficking, and sexual and physical abuse cases. Ms. Sweeney has continually received training on forensic interviewing, trauma responses, and victim dynamics.

Ms. Sweeney has been provided with minimal background information regarding this case. Her testimony will be based on her experience working with many alleged and confirmed victims of crimes involving sexual abuse and assault, her education as a licensed, master's level social worker in the state of Pennsylvania, and professional training she has received and conducted specifically regarding trafficking, online exploitation, and other crimes involving sexual abuse and assault and victim services.

**Qualifications, Publications and Testimonies**

This notice incorporates Ms. Sweeney's CV, which is being produced in this discovery volume. Ms. Sweeney has not authored any publications in the last 10 years. In the last four years, Ms. Sweeney has testified twice as an expert.

- *United States v Ryan Edward Thompson,* Criminal No. 23-211 (JRT/LIB), District of Minnesota.

- *United States v Jarrod Sanford,* Criminal No. 2:24-CR-20021-TLP, Western District of Tennessee.

**The Witness's Opinions**

The Government will move to certify Ms. Sweeney as an expert in Common Victim Dynamics in Crimes Involving Sexual Abuse & Assault.

At trial, the Government expects Ms. Sweeney to explain the ways that victims who have been sexually abused, assaulted, and exploited tend to react and cope during and after these experiences. As outlined further below, the Government expects her to describe the dynamics around the disclosure of abuse and reporting behaviors, including gradual and delayed disclosures, minimization, and recantation; victim behavior at the time of abuse/assault; victim behavior after abuse/assault and/or disclosure; as well as the dynamics of abuse/assault when the perpetrator occupies a position of trust.

JF_1461

*Disclosure of abuse and reporting behaviors*

- Many individuals who have experienced sexual abuse never disclose their experiences for a wide variety of reasons, particularly those who have experienced abuse by a known offender.

- Of those who do disclose sexual abuse, many do not disclose right away (delayed disclosure) and the disclosure may be initially tentative and/or gradual over a period of time.

- Denial of the abuse or recantation of the allegation of abuse is not uncommon.

- The impact of trauma, such as that experienced during sexual abuse, influences memory and reporting practices in a variety of ways. Recall may be affected however, this does not mean that the accuracy of the memories stored is impaired as a result.

- Cognitive, educational, and other factors impact how an individual who has been sexually abused interprets their abusive experience and the reporting process in a variety of ways.

- Many factors may influence an individual's decision to withhold or postpone a disclosure of sexual abuse including feelings of shame or responsibility for the abuse, guilt, stigma associated with the dynamics of the abuse, bribes by the offender to maintain secrecy, perceived, implicit, or explicit threats, fear of harm or negative repercussions to self or others (including the offender, family members and other parties) for disclosing, conflicted loyalties, fear that no one will believe the allegation, concern about systemic involvement, immigration consequences, past experience with law enforcement and lack of support structure.

*Victim behavior at the time of abuse*

- There is no one "normal" response for all victims. Victims of sex offenses involving sexual assault and abuse experience a wide range of responses.

- Some victims, particularly those who are young and have experienced grooming and repeated sexual abuse may not know that what they are experiencing is abuse.

- Many victims experience a sense of helplessness regarding the abuse or assault and show accommodation behaviors. As a result, one common response can be a lack of physical or verbal resistance, particularly when the abuse is ongoing and the offender is an authority figure. This may be especially true if they have attempted to disclose and active protective measures are not taken.

- Victims who experience a physiological response or pleasurable sensation during an abusive incident or who have not displayed overt resistance may feel increased confusion, self-blame, shame, or guilt regarding the abuse or assault.

*Victim behavior after abuse and/or disclosure*

- There is no standard victim behavior after abuse has occurred or a disclosure has been made.

- Some victims display behavioral and/or emotional changes while others do not. For those who do, the range of behaviors and emotions is wide and varied.

- This may also be impacted by the victim's gender, developmental level, and whether or not there is continued contact with the offender.

- The availability and level of support from others, the extent to which there is engagement in effective mental health treatment, institutional response to disclosure, cultural considerations, and many other factors may impact a victim's short and long term response in the aftermath of offenses involving sexual assault and abuse.

**Impact of abuse by a known offender/someone in a position of authority**

- The relationship between the victim and the offender has a large impact on a victim's response to the abuse, feelings about the offender, and reporting behaviors.

- Individuals who have experienced abuse by an authority figure may be less likely to disclose their experiences immediately, if at all, for a variety of reasons. The knowledge of others being abused by the offender may impact disclosure.

- Anticipated reactions to allegations of abuse may affect a victim's willingness to disclose and has an impact on various aspects of a disclosure including who the victim discloses to, the timing of the disclosure, the level of details provided, and if the victim maintains the disclosure over time (minimization or recantation). It may also impact the victim's behavior after abuse.

Ms. Sweeney has not been provided with very much specific information regarding the details of this case. Her testimony will be based on her experience working with many alleged and confirmed victims of crimes involving sexual abuse and assault, her education as a licensed, master's level social worker in the state of Pennsylvania, and professional training she has received and conducted specifically regarding trafficking, online exploitation, and other crimes involving sexual abuse and assault and victim services.

The Government reserves the right to elicit further testimony, consistent with the anticipated testimony and methods described above. The Government also reserves the right to

elicit testimony from its expert in response to other matters, which may arise during trial or in response to evidence presented in the defendant's case.

Very truly yours,

Erek L. Barron
United States Attorney

Digitally signed by CHRISTOPHER SARMA
Date: 2024.12.16 09:54:54 -05'00'

Christopher Sarma
Megan McKoy
Ranganath Manthripragada
Assistant United States Attorneys

Pursuant to Fed. R. Crim. P. 16(a)(1)(G)(v), I approve the foregoing disclosure.

Margaret Rae Sweeney, MSW, LSW
Federal Bureau of Investigation

JF_1464

# EXHIBIT D

Case 8:24-cr-00152-DLB     Document 70-1     Filed 03/07/25     Page 14 of 20

# Expert Opinion of C. J. Brainerd, PhD

**Referral Question**

I have been asked by counsel to review various documents in connection with a potential *Daubert* motion to preclude the proffered testimony of Ms. Margaret R. Sweeney in *United States v. John Richard Ferguson*. Based upon my knowledge of the scientific literature and my own research program, Mr. Ferguson's counselors have asked that I provide opinions on certain points that may help the court to evaluate the motion to preclude the proffered testimony. Should the government's proffered testimony be admitted at trial, I would testify to assist in rebutting it.

**Qualifications**

I am currently a tenured Professor at Cornell University, where I serve as Director of the Memory and Neuroscience Laboratory and as Director of the PhD/JD Program in Psychology and Law. I teach courses in the areas of memory and the law, cognitive neuroscience, developmental psychology, and the psychology of the death penalty. I direct the training of PhD students and law school students. I hold a PhD in experimental and developmental psychology. I have published more than 300 peer-reviewed journal articles and book chapters and more than 20 books. For three decades, my research has been centered on human memory, especially false memory, forgetting, and other forms of memory distortion, and on forensic applications of memory research. This research includes experimentation with subject populations whose memories are compromised in some way, such as children, adolescents, learning-disabled individuals, patients with psychosis, and patients with mild cognitive impairment and dementia. During the course of my research, I developed one of the contemporary theoretical accounts of memory distortion and forensic memory, fuzzy-trace theory, which has been widely applied in the scientific literature. In addition to my publications in peer-reviewed journals, I have long served on their editorial boards, and I have also served as Editor and Associate Editor of some of those journals. Scientists who served in those capacities are responsible for administering and applying the procedures that create reliable findings—namely, the procedures of peer review. I have been elected to the Society of Experimental Psychologists and to the National Academy of Education. I am a Fellow of 5 divisions of the American Psychological Association. I am also a Fellow of the Association of Psychological Scientists and of the Psychonomic Society. I have been qualified as an expert witness in state, federal, and military courts, including several cases that were similar in nature to the present one. I have also been qualified as an expert witness in Frye and Daubert hearings that focused on questions about the scientific reliability of expert testimony that resemble those in the present case (e.g., *State of Kentucky v. Parker*, *State of New Jersey v. J.L.G.*).

For more than three decades, I have provided expert opinions and expert testimony in criminal and civil cases in which the accuracy of allegations depended on the reliability of memory reports made by child and adolescent witnesses. Those cases include ones with allegations of sexual abuse that are similar to the present case. They also include cases in which the reliability of expert testimony such as that proffered by the government was tested.

**Opinion**

To decide whether the proposed expert testimony satisfies the *Daubert* standard of reliability, it is essential to evaluate the *source* of the content of the testimony—in particular, whether it derives from studies in the peer-reviewed scientific literature that meet the *Daubert* standard versus some other, non-scientific method. I will consider that matter throughout this section. In light of the material that will be discussed, the gist of my opinion is that the government's proposed expert testimony clearly does not satisfy the *Daubert* standard for admission of expert testimony.

### *Scientific Reliability*

Under *Daubert*, the content of expert testimony must be scientifically reliable; that is, it must derive from research that implements the scientific method of establishing reliability. To establish a clear contrast between scientific reliability and the unreliable bases for the proposed testimony, I first discuss what scientific reliability must consist of, which is that it follows a few simple principles.

As spelled out in the *Daubert* standard, scientists generate reliable evidence on a specific topic by, first, formulating it as a hypothesis that can actually be confirmed or disconfirmed in an experiment, by, second, conducting experiments that use appropriate procedures with known error rates (which allows tests of statistical significance and effect size to be computed), by, third, publishing the results in peer-reviewed journals (where knowledgeable peers determine if the hypothesis was actually testable and the procedures were actually appropriate), and by, fourth, building consensus within the scientific community by conducting further research that replicates and extends the experiments' findings. To the extent that these principles are kept firmly in mind, the inherent reliability problems with expert opinions that are based on non-scientific methods become clear.

The aforementioned rules for establishing scientific reliability are not the basis for the content of Ms. Sweeney's proffered testimony. Instead, it will derive from the professional experience, education, and training of the witness; that is, the memory and judgment of one person. Hence, the basis for the proposed testimony is not objective and publicly verified, as scientific evidence is. Rather, Ms. Sweeney's proffered testimony is subjective, personal, and, therefore, prone to well-known psychological illusions and biases. What is being proposed, then, is to present evidence whose sources lie outside the boundaries of scientific reliability and are not constrained by its methods and findings—specifically, the four rules that I mentioned. Needless to say, there can be no consensus in any scientific community that evidence that derives from unscientific methods is scientifically reliable. That would be an oxymoron. The inherent reliability problems with such evidence are well illustrated by historical examples of expert evidence that (a) was based on professional experience (often called clinical experience or professional wisdom), education, and training, (b) was presented to triers of fact for many years, but (c) was eventually shown to be unreliable when it was converted to testable hypotheses and evaluated with the scientific method.

### *The RMS Example of Unreliability*

A classic example in the realm of sexual abuse of children is provided by repressed memory syndrome (RMS), which was the basis of the recovered memory epidemic of the 1980s and 1990s.  RMS supplied the grounds for many criminal prosecutions and civil actions, and it was central to expert testimony provided by clinical practitioners that was founded on their professional experience, education, and training.  In these cases, adult claimants accused defendants of having sexually abused them as children, on the strength of new memories that had recently been exhumed during therapy, using methods (e.g., age regression, bibliotherapy, journaling) whose safety and effectiveness had not been scientifically substantiated.  In that era, RMS was commonly accepted by therapists and counselors, on the basis of their professional experience, their graduate education, and their post-graduate training.  Expert testimony by such practitioners on the reliability of RMS was widely admitted in criminal and civil cases.  Ultimately, however, RMS was debunked in scientific experiments conducted by memory researchers.

Initially, some researchers pointed out that RMS lacked scientific substantiation of the sort that is required under *Daubert*, and further, that despite thousands of claims of adult recovery of repressed childhood memories of sexual abuse, there were no examples in the scientific literature in which any instances of RMS had been confirmed by unimpeachable independent evidence.  Next, other researchers pointed out that RMS was scientifically unreliable on its face because it violated four fundamental laws of human memory that have been confirmed in hundreds of controlled experiments.  They are the proximity law of accuracy, the encoding specificity law, the traumatic salience law, and the verbatim fade-out law.  Finally, despite the enormous difficulty of determining the accuracy of memories for events that are decades in the past, cases were identified in which adult recovered memories of childhood sexual abuse, though strongly believed, were demonstrably false because physical evidence showed that the events could not have happened (e.g., Binjimin Wilkomirski, Elizabeth Rutherford).  The denouement was that RMS was ruled to be scientifically unreliable in *Frye* and *Daubert* hearings (e.g., the *Hungerford-Morahan* hearing in New Hampshire), and some practitioners' licenses were suspended for practicing recovered memory therapy, but only after much damage to individuals and families in legal proceedings (Brainerd, C. J. *The science of false memory*. New York: Oxford University Press, 2005).

A remaining question that most of us would ask, because it bears so directly on the unreliability of evidence derived from professional experience, education, and training, is:  How could so many people with so much experience and training have been so wrong for so long?  Here, it is instructive to consider the following point.  The job of practitioners when working with child or adult clients who allege sexual abuse is not to act as fact finders.  Rather, their job, which is to understand their clients' problems and help them overcome those problems, actually conflicts with fact finding.  The conflict is that practitioners are trained to accept and understand whatever realities their clients believe are affecting them – not to challenge clients' beliefs in order to find the facts.  Moreover, in the course of accepting their clients' realities in order to

help them, it is difficult not to commit the error of assuming that those realities are objectively true, even to the point of representing them as true in legal proceedings. This error, which is an instance of the familiar psychological phenomenon of confirmation bias, is so seductive that practitioners' professional societies have found it necessary to issue resolutions warning against it. A well-known illustration is a caution that the American Medical Association issued to psychiatrists in connection with RMS, which stated in part that "few cases in which adults make accusations of childhood sexual abuse based on recovered memories can be proved or disproved and it is not yet known how to distinguish true memories from imagined events in these cases." (Council on Scientific Affairs, American Medical Association, Annual Meeting, 1995).

As the RMS example illustrates, the core problem with expert testimony whose content has not been shown to be scientifically reliable is that it can simply be wrong in the sense that it presents information to the trier of fact that cannot be shown to be reliable---and is, in fact, actually *unreliable*. It is worth noting that instances of this problem can be found in the content of the proposed testimony of Ms. Sweeney. For one, Ms. Sweeney says the basis of her opinion is interviews with witnesses and victims. It is not based on, for example, a hypothesis that is tested for reliability. There is no indication that she ever tested or confirmed that, of the "2,500 interviews" of witnesses and children she conducted, that she verified that abuse actually occurred.

Not only does Ms. Sweeney's disclosure provide no basis to ascertain reliability, it appears she plans to testify about concepts that are highly unreliable. Specifically, some of the behaviors of children and adolescents who allege sexual abuse that will be described in the testimony are well-known claims of Roland Summit's child sexual abuse accommodation syndrome (CSAAS). Salient examples of such behaviors are: gradual and delayed disclosure, denial of abuse, grooming and resistance to abuse, secrecy, the dynamics of disclosure, and recantation of disclosures (*State of New Jersey v J.L.G.*). Although this terminology is not specifically acknowledged in the government's expert disclosure, the topics Ms. Sweeney proposes to testify about are straight out of CSAAS. As a few examples:

| CSAAS Concept | Ms. Sweeney's Proposed Testimony |
|---|---|
| CSAAS covers the concept of sexually abused children "fac[ing] 'an overpowering adult' who 'is often in a trusted and apparently loving position."[1] | Ms. Sweeney proposes to testify about the "[i]mpact of abuse by a known offender/someone in a position of authority." |
| Two of the CSAAS behaviors are "helplessness" and "accommodation."[2] | Ms. Sweeney proposes to testify about how "[m]any victims experience a sense of **helplessness** regarding the abuse or assault and show **accommodation** behaviors." (emphases added). |

---

[1] *State v. J.L.G.*, 190 A.3d 442, 452 (N.J. 2018) (quoting Roland C. Summit, *The Child Sexual Abuse Accommodation Syndrome*, 7 Child Abuse & Neglect 177, 182-83 (1983)).
[2] *Id.* (quoting *Summit, supra*, at 182-83, 186-87).

-4-

| | |
|---|---|
| In describing CSAAS, Dr. Summit wrote that children will not "forcibly resist," but rather will "submit quietly."[3] | Ms. Sweeney proposes to testify that "one common response" to sexual abuse is "a lack of physical or verbal resistance." |
| "Finally, on retraction, Dr. Summit wrote that . . . the 'normal' course [is to] retract her complaint."[4] | Ms. Sweeney proposes to testify that "[d]enial of the abuse or recantation of the allegation of abuse is not uncommon." |

### *The CSAAS Example of Unreliability*

The problem with presenting evidence that features the precepts of CSAAS is that CSAAS is a well-known but debunked clinical hypothesis about victims of child sexual abuse that, like RMS, provides an instructive case study in the fallibility of expert evidence that derives from professional experience, education, and training. CSAAS was proposed three decades ago by Dr. Roland Summit. As is true for most invalid clinical hypotheses (e.g., claims about the effectiveness of hydroxychloroquine and convalescent plasma during the Covid19 pandemic), CSAAS was based on Summit's professional experience, education, and training—in particular, experience treating adult women who reported a prior history of child sexual abuse. Summit conducted no research on CSAAS, and there was no scientific substantiation of it by others. Rather, it was based on an unreliable form of professional inference, which is known as behavioral symptomology. Despite the lack of scientific substantiation, as in the present case, the precepts of CSAAS have long figured prominently in expert testimony provided by practitioners who work with clients who allege sexual abuse histories. At last count, such testimony has been presented in criminal cases in over 40 states. Remarkably, until 2017 no court had conducted a *Frye* or *Daubert* hearing to determine whether CSAAS was scientifically reliable. The first *Frye* hearing occurred in New Jersey Superior Court (*State of New Jersey v. J.L.G.*). The evidence presented there showed that multiple peer-reviewed scientific literature reviews had been published that documented both the original lack of scientific substantiation of CSAAS's claims and subsequent scientific disconfirmation of those claims. More explicitly, when qualified psychological researchers reviewed the scientific literature and published their findings in peer-reviewed articles, the findings did not substantiate CSAAS's claims.

The evidence presented at the New Jersey *Frye* hearing also showed that Summit himself had not intended that CSAAS be used for purposes beyond therapy and had cautioned against the use of CSAAS's claims in expert testimony. Even with such qualifications, however, it is important to note the CSAAS is not recognized as an accepted diagnosis in the Diagnostic and Statistics Manual of the American Psychiatric Association. The Superior Court ruled that CSAAS is not reliable, and its precepts cannot therefore be presented in expert testimony. That ruling was subsequently upheld by the New Jersey Supreme Court (*State of New Jersey v J.L.G.*). Both courts ruled that the claims of CSAAS that there is a constellation of behaviors and reactions that are reliably associated with child sexual abuse have never been scientifically

---

[3] *Id.* (quoting *Summit*, *supra*, at 183).
[4] *Id.* (quoting *Summit*, *supra*, at 188).

substantiated, have not gained general acceptance in the relevant scientific community, and that some of these claims have been directly disconfirmed by scientific research.

*Conclusions*

In closing, I stress that the larger lesson of examples such as RMS and CSAAS testimony revolves around the inherent unreliability of evidence that derives from professional experience, education, and training, rather than from research that implements the scientific method described earlier.  There are many reasons for this inherent reliability problem, but perhaps the most fundamental ones are the lack of public accountability and revision of knowledge that are the hallmarks of peer review and independent replication.  An individual scientific study may be conducted using confounded, inappropriate, or otherwise limited procedures, leading to unreliable findings.  The process of peer review is designed to detect such errors, preventing publication of the findings in the scientific archive until they are revised in subsequent research. Sometimes, the errors escape detection at the peer-review stage, and the findings are published. Then, however, the next step follows: independent replications by other researchers.  If the findings are unreliable by-products of confounded methods, they will not stand up to replication. In the end, scientific consensus as to the reliability of any set of findings builds apace as the number of peer-reviewed publications and independent replications grows.  Neither of these public checks on unreliability applies to testimony derived from professional experience, education, and training, which is the type of testimony offered by the government through Ms. Sweeney in this case.  Owing to that fact, examples such as RMS and CSAAS, in which unreliable clinical syndromes and treatments have persisted in expert testimony for many years before the courts ruled them to be unreliable are common.  In the case of CSAAS, the fact that it is not scientifically reliable is self-evident from the fact that the first two steps that I described earlier were never taken:  Summit never formulated it as a testable hypothesis and never conducted any experiments to test such a hypothesis.

To sum up, I have explained how scientific reliability works under *Daubert*—how scientists produce facts that can be accepted as reliable under that standard.  I have also attempted to explain why the alternative method that is the basis for the proposed testimony from Ms. Sweeney does not produce evidence that satisfies the *Daubert* standard.  Indeed, there are well-known examples in which that method has produced unreliable evidence that was central to expert testimony for many years before courts ruled, on the basis of scientific findings, that it was unreliable.  For those reasons, the government's proposed expert testimony in the present case is clearly not reliable by the *Daubert* standard.

Cordially,

*C. J. Brainerd* (signature)

C. J. Brainerd, PhD